## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**TERRY SAULSBERRY,**                                       )
                                                           )
      **Plaintiff,**                                        )
                                                           )
**v.**                                                     )
                                                           )   **Case No. _____**
**JEFF SESSIONS,**                                         )
**As the Attorney General**                                )
**of the United States,**                                  )
**United States Department of Justice,**                   )
                                                           )
      **Defendant.**                                       )
_____  )

## COMPLAINT AND DEMAND FOR JURY TRIAL

      Dr. Terry J. Saulsberry, by and through his undersigned counsel, hereby files this

Complaint against Jeff Sessions, as the Attorney General of the United States, for discrimination,

retaliation, and hostile work environment in violation of the Civil Rights Act of 1964, as

amended, 42 U.S.C. 2000e *et seq.* ("Title VII").

## PARTIES AND JURISDICTION

      1.     Dr. Saulsberry is an African American male.  Dr. Saulsberry has been employed

by the United States Department of Justice, Federal Bureau of Prisons (the "Bureau") for

approximately 15 years.  Dr. Saulsberry's current duty station, and his duty station at the times

relevant to this complaint, is the Bureau's central office, located at 320 1st Street, NW, Building

400, RM 2017, Washington, D.C. 20534.

      2.     Defendant Jeff Sessions is the Attorney General of the United States and the head

of the United States Department of Justice.  The Bureau, which is a division of the Department

of Justice, is an agency as that term is defined in 5 U.S.C. § 552(a)(1) for the purposes of 42

U.S.C. § 2000e-16(a).  Jeff Sessions is sued in his capacity as Attorney General and head of the United States Department of Justice.

3.      Jurisdiction is proper in this Court pursuant to 42 U.S.C. § 2000e-16(c) and 28 U.S.C. § 1331 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce."

4.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), as Mr. Sessions is the head of a governmental agency of the United States that does business in and is headquartered in the District of Columbia.  Dr. Saulsberry works in the Bureau's headquarters located in the District of Columbia, many decisions made and events giving rise to this action occurred in the District of Columbia, and key documents, including employment records, and witnesses are located in the District of Columbia.

5.      Dr. Saulsberry filed his formal complaint of discrimination with the United States Department of Justice, Federal Bureau of Prisons Equal Employment Opportunity Office ("EEO Office") on March 1, 2016, alleging discrimination on the basis of his race (African-American) and gender (male).  Dr. Saulsberry subsequently supplemented his charge on May 11, 2016 alleging retaliation in response to his then-pending EEO activity.  It has now been more than 180 days from the date his complaint was filed and no final decision has been rendered. Accordingly, Dr. Saulsberry exhausted his administrative remedies and may pursue his claims in this Court pursuant to 42 U.S.C. § 2000e-16(c).

## FACTS

### Background of Dr. Saulsberry's Employment

6.      Dr. Saulsberry's career with the Bureau spans more than 15 years.  During this time, he has worked in numerous positions at nearly all levels of the Bureau.

7.      Dr. Saulsberry originally joined the Bureau as a Staff Chaplain in South Carolina (FCI Estill) before moving to the same position in Atlanta, Georgia (USP Atlanta).  From there, Dr. Saulsberry was then promoted to two supervisory chaplain positions, first in Maryland (FCI Cumberland) and then in Florida (FCI Marinna), with a staff of two at each location.  Dr. Saulsberry was then promoted to Complex Supervisory Chaplain in Butner, North Carolina (FCC Butner), with a staff of 13.

8.      In these positions, Dr. Saulsberry worked with both male and female inmates and served at almost every security level and mission critical institution in the Bureau, including minimum security, medium security, maximum security, penitentiary, detention center, medical centers, and protective custody units.  Dr. Saulsberry had supervisory authority for nearly 20 staff members and oversight over more than 500 volunteers and 20 contractors.  Dr. Saulsberry also served at various times as Acting Associate Warden and Acting Regional Chaplaincy Administrator.

9.      At each stop along the way, Dr. Saulsberry demonstrated exceptional skill, dedication, and expertise.  This is most aptly reflected in his many promotions, outstanding performance reviews, and commendations from staff, peers, and supervisors alike.

10.     In fact, Dr. Saulsberry's performance was so outstanding that he received a promotion to the central office in June 2012.  Specifically, Dr. Saulsberry was promoted to the position of Administrative Program Manager, a GS-14 level position, in the Chaplaincy Services Branch.

11.     From June 2012 to November 2015, Dr. Saulsberry reported directly to Dr. Michael Smith, an African-American male, who served as the Chaplaincy Administrator (also known as the Chief Chaplain or Branch Chief).  Dr. Smith, in turn, reported to Kathryn Tracy, a

Caucasian Female, who was the Senior Deputy Assistant Director of the Reentry Services Division.  Ms. Tracy reported to Linda McGrew, an African American female, who served as the Assistant Director of the Reentry Services Division.

12.     In addition to Dr. Saulsberry, three other employees reported directly to Dr. Smith in the Reentry Services Division: Heidi Kugler (Caucasian female), the Assistant Chaplaincy Administrator, Kyu Lee (Asian male), the Faith Based Coordinator, and Anders Pederson (Caucasian male), the Administrative Program Manager.

13.     In November 2015, Dr. Smith retired from the Agency, leaving a vacancy which was filled by Heidi Kugler, as described herein.  In December 2015, Linda McGrew retired and was replaced by Marion Feather.  In April 2015, Kathryn Tracy transferred to an institution warden position and was replaced by Patti Butterfield.

**History of Discrimination and Retaliation**

14.     During nearly the entirety of Dr. Saulsberry's tenure in the central office, he has been subjected to a pattern of discrimination on the basis of his race and gender, first by Ms. McGrew and Ms. Tracy and later by Ms. Kugler.  As detailed herein, Dr. Saulsberry was repeatedly denied opportunities for career advancement given to females and Caucasians, including denial of a promotion to the GS-15 level Chief Chaplain position upon Dr. Smith's departure from the Bureau in November 2015.  Dr. Saulsberry was also subjected to unfair criticisms and unjust double standards.  The actions of these employees in fact represent a broader pattern of discrimination throughout all of the central office with respect to men and African-Americans.

15.     The pattern of discrimination and impartial favoritism began almost immediately upon Dr. Saulsberry's arrival in the central office.  After Dr. Saulsberry's arrival, Ms. Tracy was

4

only willing to work and communicate directly with Ms. Kugler and the other non-African-Americans in the office and supported them directly in endeavors and initiatives which they were pursuing.  In contrast, Ms. Tracy rarely, if ever, spoke with, worked with, or supported Dr. Saulsberry, the only African-American male GS-14 in the office.

16.     For example, throughout Dr. Saulsberry's time in the central office, he submitted a number of projects and proposals to Dr. Smith which required approval from Ms. Tracy and Ms. McGrew.  Often, Ms. Tracy and Ms. McGrew would delay meeting with Dr. Smith regarding Dr. Saulsberry's projects and proposals for weeks or not meet with Dr. Smith at all.  In contrast, initiatives and projects proposed by other, non-African-Americans and females were received quickly up the chain and were approved by Ms. Tracy and Ms. McGrew.  Frequently, Ms. Kugler in particular was permitted to bypass Dr. Smith altogether and speak directly with Ms. Tracy and Ms. McGrew regarding her projects, initiatives, and proposals.

17.     In fact, Dr. Smith himself was frequently passed over entirely, as Ms. Tracy often worked with his non-African-American and female staff rather than working through him.  On the occasions when Ms. Tracy would grant Dr. Smith a meeting, she would schedule the meeting for the end of the working day, only minutes before Dr. Smith's commuter train was scheduled to depart the city, a fact of which Ms. Tracy was well aware.

18.     The same was true with respect to meeting requests from Dr. Saulsberry.  On the occasions Ms. Tracy granted Dr. Saulsberry's meeting requests, it was always at the end of the work day just before Dr. Saulsberry was scheduled to depart.  In contrast, other Bureau employees, including specifically Ms. Kugler, had a free pass to meet with Ms. Tracy whenever they desired.

19.     This "cold shoulder" approach manifested itself not only with meetings, projects, tasks, and initiatives in the office, but also with daily pleasantries in the office as well, as Ms. Tracy was not even willing to greet Dr. Saulsberry at the office in the mornings. Overall, Dr. Saulsberry was ostracized and marginalized in the office and treated like a lesser, insignificant employee.

20.     Dr. Saulsberry was subjected to disparate treatment on the basis of his race and gender in other ways as well, including unfair and unjust criticism at the hands of Ms. Tracy.

21.     For example, in September 2012, Dr. Saulsberry was asked to do a prayer for the Bureau annual award ceremony luncheon.  Dr. Saulsberry led a non-sectarian prayer, as he and other Bureau employees normally do.  However, following the luncheon, Ms. Tracy contacted Dr. Smith and criticized Dr. Saulsberry's prayer, stating that Dr. Smith had to "talk to Terry about praying."  Neither Dr. Saulsberry nor Dr. Smith understood why Ms. Tracy had an issue with Dr. Saulsberry's prayer.  When other Caucasian colleagues led similar prayers, Ms. Tracy never complained to Dr. Smith or otherwise.

22.     On another occasion, also in September 2012, Dr. Saulsberry was invited by the African Methodist Episcopal Church, with whom he had been working on a number of Bureau projects, to participate in a seminar taking place in January 2013 in Memphis, Tennessee.  The purpose of the seminar was to train over 100 volunteers to be prison ministry chaplains, a project which would be extremely beneficial to the Bureau.  When Dr. Saulsberry requested permission to attend the seminar, Ms. Tracy denied the request and responded "I don't know who all these black people are who's going to be at this seminar.  For all I know, Louis Farrakhan could be one of the speakers."  This statement was discriminatory, as Ms. Tracy expressed general distaste for a large gathering of African-Americans and of Louis Farrakhan, a well-known African-American

social justice and equality advocate.  Only when the Director of the Bureau intervened at the request of the African Methodist Episcopal Church was Dr. Saulsberry permitted to attend the conference.

23.     Another example of the mistreatment and disparate treatment occurred in August 2013 when Dr. Saulsberry attempted to create a Bureau newsletter.  As Program Manager, Dr. Saulsberry is responsible for all the programs within the Chaplaincy Services Branch, including training and professional development of chaplains.  In furtherance of his responsibilities, Dr. Saulsberry, with the approval of Dr. Smith, started a newsletter, called "On the Same Page," which highlighted upcoming chaplaincy training, discussed events in the branch, and supplied other general information to the chaplains in the field.  Previously, the branch had run a similar newsletter, and Dr. Saulsberry believed bringing the newsletter back would be a tremendous value to the Bureau.

24.     When Ms. Tracy discovered that Dr. Saulsberry had started the newsletter, Ms. Tracy ordered that the newsletter could not be produced and derisively stated "[i]f Terry doesn't have anything else to do, I'll find something for him to do."  Approximately one month later, Ms. Kugler began her own newsletter, called "Centering Thoughts," which covered similar topics as Dr. Saulsberry's newsletter.  Ms. Tracy gave her full support to Ms. Kugler's newsletter.

25.     In addition to being alternatively ignored and unfairly criticized by Ms. Tracy, Dr. Saulsberry was also denied numerous important opportunities within the Bureau for training and experience which would have allowed him to move up through the agency.  In contrast, Caucasian and female employees, including specifically Ms. Kugler, were given numerous growth and leadership opportunities.

26.     For example, throughout the tenure of Dr. Smith as the Chief of the Chaplaincy

Services Branch, Dr. Saulsberry repeatedly requested the opportunity to serve as the Acting

Chief during Dr. Smith's absences from the office.  Serving as Acting Chief of Chaplaincy

Services/Branch Chief gives employees critical experience performing high-level, supervisory

functions and is an important responsibility for purposes of career advancement.

27.     However, Ms. Tracy never permitted Dr. Saulsberry to serve as the Acting Chief.

Rather, Ms. Tracy stated that she only ever wanted Ms. Kugler to serve as the Acting Chief

during Dr. Smith's absences. This instruction ran counter to established Bureau policy and

practice, which dictated that several different direct reports should rotate in the Acting position.

28.     In fact, Ms. Tracy also never permitted Dr. Smith to act as the Senior Deputy

Assistant Director in her absences.  Instead, Ms. Tracy would only permit the other Caucasian

Branch Chiefs to act for her.

29.     Ms. Tracy and Ms. McGrew also blocked Dr. Saulsberry's efforts to be accepted

to the Department of Justice's Leadership Excellence and Achievement Program ("LEAP").  The

LEAP program is an important management and leadership program for Bureau employees and

other employees of the Department of Justice.  Although Dr. Saulsberry applied two years while

in the central office, he was never accepted.  In contrast, Ms. Tracy aided other Caucasian and

female employees, including specifically Ms. Kugler, with the application process by discussing

applications with them and ferrying the application through Human Resources.  The only

employees to be accepted to the LEAP program from Dr. Saulsberry's division during his tenure

in the central office have been females, including Ms. Kugler.  However, Dr. Saulsberry has had

as much as or more experience than all applicants who were accepted, but was never accepted

himself.

30.     The discriminatory conduct peaked in November 2015 when Dr. Saulsberry was passed over for the GS-15 Chief of Chaplaincy Services position in favor of Ms. Kugler.  In June 2015, Dr. Smith announced his retirement from the Bureau and the GS-15 Chief of Chaplaincy Services position was advertised for applications in August.  Dr. Saulsberry applied for the position and, despite being the most qualified candidate, was rejected.  Instead, the position was given to Ms. Kugler.

31.     Dr. Saulsberry has significantly more experience than Ms. Kugler and was a more qualified candidate for the Chief of Chaplaincy Services position.  For example, Dr. Saulsberry has a greater depth and breadth of experience with the Bureau.  He has been with the Bureau for more than 14 years, while Ms. Kugler has only been with the Bureau for 12 years.  Likewise, before coming to the Central Office, Dr. Saulsberry served at five different facilities covering every level of correctional facilities and nearly every type of institution under the Bureau's authority and worked with both male and female inmates.  He held two Staff Chaplain positions, two Supervisory Chaplain positions, and one Complex Supervisory Chaplain position.  In contrast, Ms. Kugler only worked at two facilities and only held one Staff Chaplain position and one Supervisory Chaplain position.  Dr. Saulsberry has supervised more staff, worked with more volunteers and contractors, and been responsible for more inmates than has Ms. Kugler.  Dr. Saulsberry also has a higher level of education than Ms. Kugler, with a Bachelor of Science, Bachelor of Arts, Master of Divinity, and Doctorate of Ministry.  Nevertheless, Ms. Kugler was given the position.

32.     Moreover, in contravention of Bureau practice and policy, Dr. Saulsberry was not notified of his non-selection for the position by Ms. McGrew, the selecting official, or some other Bureau official.  Instead, he was called into a meeting by Ms. Kugler herself, who informed

9

him that she had been selected as the new Chief Chaplain and had been instructed to inform him and the other candidates that they had not been selected.  Not only was this a breach of protocol, but it was also extremely humiliating and degrading.

33.     After Ms. Kugler's promotion, Mr. Kevin Kelley, a Caucasian male, was promoted to the Assistant Chaplaincy Administrator position vacated by Ms. Kugler on February 25, 2016.  Mr. Kelley received the promotion despite having an extensive history of misconduct and inappropriate behavior with the Bureau, including expressing discriminatory biases against African-Americans, and received the promotion over other at least one other, more qualified African-American candidate.  Among other things, Mr. Kelley has made explicit references to pornography, sex, and rape, and expressed disdain for Dr. Saulsberry and other African American males in the Branch.

34.     On one occasion in late April 2014, for example, Mr. Kelley made a presentation before 90 supervisory and staff chaplains and Central Office Chaplaincy Administrators and training center staff at the Management and Specialty Training Center in Aurora, Colorado.  During the presentation, Mr. Kelley discussed a pornographic movie, which disturbed and upset several persons in attendance.  Following the presentation, Dr. Saulsberry wrote a memorandum regarding the incident and provided it to Bureau management, leading to an internal investigation.  Mr. Kelley discovered that Dr. Saulsberry had written the memorandum, and thereafter became overtly hostile towards him.  By promoting Mr. Kelley to the Assistant Chaplaincy Administrator position, the Bureau yet again demonstrated discriminatory biases and favoritism towards non-African-Americans, even when the Caucasian employee being promoted has extensive history of racially and sexually charged comments.

35.     After the Bureau promoted Ms. Kugler to the Chief Chaplain position, Dr. Saulsberry filed an informal complaint of discrimination against the Bureau on or about November 24, 2015 and a formal complaint of discrimination against the Bureau on or about March 1, 2016.  Thereafter, the Bureau, primarily through the actions of Ms. Kugler, continued to discriminate against Dr. Saulsberry and retaliated against Dr. Saulsberry for pursuing his EEO claim against the Bureau.

36.     Specifically, Ms. Kugler has continued Ms. Tracy's prior practice of minimizing Dr. Saulsberry's role in the Division, rejecting his proposals and initiatives, and unjustly and unfairly criticizing his work.

37.     The unfair criticism manifested itself most clearly in connection with Dr. Saulsberry's Performance Work Plan ("PWP") and his 2016 final performance evaluation.  At the beginning of each rating period year, Bureau employees are supposed to receive a PWP outlining the goals for the year and the metrics against which the employee will be judged for his or her annual performance review.  However, rather than issue Dr. Saulsberry his PWP at the beginning of the rating period, April 1, 2015, per the Bureau's regulations, Dr. Saulsberry did not receive his PWP until October 1, 2015, six months after the start of the rating period.

38.     This extensive delay created a tremendous hardship on Dr. Saulsberry with respect to achieving his annual goals.  Because he did not receive the Bureau's performance measures at the beginning of the review period, he found himself at a six-month deficit in meeting the goals identified in the PWP.  This put Dr. Saulsberry at an unfair disadvantage compared to his colleagues and peers.  Despite this tremendous disadvantage, Dr. Saulsberry, as he has done throughout his tenure with the Bureau, performed exceptionally well and exceeded each of his performance measures identified in the PWP.

11

39.     Nevertheless, when his 2016 final performance evaluation was issued on April 15, 2016, Dr. Saulsberry learned he had received only an "Excellent" rating, rather than an "Outstanding" rating, from Ms. Kugler.  Dr. Saulsberry achieved an Outstanding rating each of the preceding two years and his achievements in 2016 warranted another Outstanding rating.

40.     Dr. Saulsberry met with Ms. Kugler the same day to discuss his rating.  Ms. Kugler was immediately dismissive of Dr. Saulsberry's concerns.  According to Ms. Kugler, Marion Feather, the new Assistant Director of the Reentry Services Division who had replaced Ms. McGrew, had changed the rating system.  Rather than having to go "above and beyond" the performance measures to receive an Outstanding rating, as had been previously published by the Bureau, Dr. Saulsberry was now excepted to go "above and beyond above and beyond."

41.     This standard was not only nonsensical, but confirmed by Ms. Feather during the EEO process to not be true, as she testified that she had not changed Dr. Saulsberry's work performance standard.  Moreover, even if the standard had been changed, it had never been communicated to Dr. Saulsberry before his meeting with Ms. Kugler.  Bureau standards and basic Merit System Protections Board principles dictate that any changes to a performance review policy or standard be communicated to the employee.  This did not occur—neither Ms. Feather nor Ms. Kugler (or any other Bureau employee) relayed this change to Dr. Saulsberry, yet Ms. Kugler used this phony, heightened standard to reduce his performance review rating for the year.

42.     During the meeting with Ms. Kugler, Dr. Saulsberry also requested that Ms. Kugler correct one of the performance measures in which she had entered the wrong information for Dr. Saulsberry, which she refused to do.

43.     Following the meeting, Dr. Saulsberry prepared a memorandum to Dr. Thomas Kane, the Acting Director of the Agency ("Memorandum") addressing his concerns with the rating process.  Dr. Saulsberry delivered a copy of the Memorandum to Ms. Kugler on April 21, 2016 so that she could pass it through the chain of command to the executive level, per standard Bureau practice.

44.     On April 25, 2016, shortly after Dr. Saulsberry had delivered the Memorandum to Ms. Kugler, Ms. Kugler informed Dr. Saulsberry that she and Ms. Butterfield were standing by the rating given to him. They also refused to correct the performance measure in which Ms. Kugler had entered incorrect information.  Three days later, on April 28, 2016, Ms. Kugler returned the Memorandum to Dr. Saulsberry and stated that she had "addressed all concerns" he had identified.  The Memorandum was returned unsigned by anyone in Dr. Saulsberry's chain of command, indicating that it had never left Ms. Kugler's desk.

45.     Subsequently, on May 4, 2016, Dr. Saulsberry delivered another memorandum to Dr. Kane.  In that memorandum, Dr. Saulsberry reiterated his concerns with the performance rating process, including the late issuance of his performance measures, the change, without notice, of the standard against which he was being judged, and his overall rating.  The same day, Dr. Saulsberry was contacted by Sue Cimino, Human Resource Manager, and informed that the Agency would not address his concerns with the performance process and performance rating.

## COUNT I
## Discrimination in Violation of Title VII

46.     Dr. Saulsberry re-alleges and incorporates by reference Paragraphs 1 through 45 as if set forth fully herein.

47.     The Bureau, with the intent of discriminating against Dr. Saulsberry, engaged in a pattern of discriminatory behavior based on Dr. Saulsberry's sex (male) and race (African-

American) as described herein, and, based on and as a result of that discrimination, denied Dr.

Saulsberry a promotion to the Chief Chaplain position for which he was the most qualified

candidate, instead promotion a less qualified Caucasian female.

48.     Dr. Saulsberry's race and sex together were the motivating factors for the denial

of promotion.

49.     The denial of promotion violated Title VII, 42 U.S.C. § 2000e *et seq.*, and

therefore entitles Dr. Saulsberry to relief.

50.     As a direct and proximate result of the Bureau's discriminatory conduct, Dr.

Saulsberry has suffered and continues to suffer injury and damage in the form of past and future

loss of income and benefits of employment, lost career and business opportunities and

advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished

self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for

his future ability to earn a living, and emotional distress.

51.     Due to the conscious, wanton, and or reckless disregard for Dr. Saulsberry's

federally protected rights and the severity of the Bureau's conduct, Dr. Saulsberry is entitled to

punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Saulsberry prays on his behalf that this Court grant judgment in his

favor against the Bureau, and further:

A.  Award compensatory damages, consisting of back pay, front pay, economic loss,

    humiliation, embarrassment, mental anguish and emotional distress caused by the

    Bureau's acts in an amount not less than $600,000;

B.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

C.  Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

D.  Award equitable relief, including but not limited to promotion to a GS-15 level position or higher, appropriate training, and reassignment; and

E.  Order such other relief as this Court deems just and equitable.

## COUNT II
## Hostile Work Environment

52.     Dr. Saulsberry re-alleges and incorporates by reference Paragraphs 1 through 45 as if set forth fully herein.

53.     The Bureau, primarily through the acts of Ms. Tracy, Ms. McGrew, and Ms. Kugler, with the intent of discriminating against Dr. Saulsberry, engaged in a pattern of discriminatory behavior based on Dr. Saulsberry's sex (male) and race (African-American) and retaliatory behavior based on Dr. Saulsberry's EEO activity as described herein, including:

a.  Ignoring and ostracizing Dr. Saulsberry in the central office, while supporting, encouraging, and communicating with Caucasians and females;

b.  Rejecting Dr. Saulsberry's proposals and initiatives, while accepting the same or similar proposals and initiatives from Caucasians and females;

c.  Unfairly and unjust criticizing Dr. Saulsberry's performance, while not levying the same criticism on Caucasians and females;

d.  Diminishing and marginalizing Dr. Saulsberry's role in the central office, while raising the positions of Caucasians and females;

e.  Blocking Dr. Saulsberry from important career growth opportunities, while approving Caucasians and females for the opportunities;

     f.   Rejecting Dr. Saulsberry for a promotion for which he was most qualified candidate, while giving the promotion instead to a Caucasian female;

     g.   Promoting an atmosphere of aggression and racism by promoting a Caucasian employee with known history or racially and sexually charged comments and blatant antagonism towards Dr. Saulsberry and by minimizing and marginalizing African-American males in the office generally; and

     h.   Falsely deflating Dr. Saulsberry's evaluation, delaying the issuance of Dr. Saulsberry's PWP, and judging Dr. Saulsberry by an artificially inflated standard.

54.     Dr. Saulsberry's race, sex, and prior EEO activity together were the motivating factors for the discriminatory and retaliatory conduct.

55.     Dr. Saulsberry did not welcome this conduct and perceived the working environment to be abusive and hostile.  A reasonable person in Dr. Saulsberry's circumstances would consider the work environment to be abusive or hostile.

56.     The Bureau's conduct was sufficiently severe and/or pervasive to alter the conditions of Dr. Saulsberry's employment and create an abusive and/or hostile working environment in violation of Title VII.

57.     As a direct and proximate result of the Bureau's discriminatory conduct, Dr. Saulsberry has suffered and continues to suffer injury and damage in the form of past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for his future ability to earn a living, and emotional distress.

58.     Due to the conscious, wanton, and or reckless disregard for Dr. Saulsberry's federally protected rights and the severity of the Bureau's conduct, Dr. Saulsberry is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Saulsberry prays on his behalf that this Court grant judgment in his favor against the Bureau, and further:

A.  Award compensatory damages, consisting of back pay, front pay, economic loss, humiliation, embarrassment, mental anguish and emotional distress caused by the Bureau's acts in an amount not less than $600,000;

B.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

C.  Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

D.  Award equitable relief, including but not limited to promotion to a GS-15 level position or higher, appropriate training, and reassignment; and

E.  Order such other relief as this Court deems just and equitable.

Respectfully Submitted,

_____/s/ Nicholas Hantzes_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Mr. Saulsberry demands a trial on all claims to which he is entitled to a jury.


Respectfully Submitted,


_____/s/ Nicholas Hantzes_____
Nicholas Hantzes, DC Bar No. 361450
Michael Hall, Fed. DC Bar No. VA016
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4434
nhantzes@hantzeslaw.com
mhall@hantzeslaw.com
*Counsel for Plaintiff*