## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TERRY SAULSBERRY,** )<br><br>**Plaintiff,** )<br><br>v. )<br><br>**WILLIAM P. BARR,**[1] )<br>**in his capacity as the Attorney General of the** )<br>**United States,** )<br><br>**Defendant.** ) | **Case No. 17-cv-00384 (APM)** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendant William Barr's Motion for Summary Judgment on the two remaining counts of Plaintiff Terry Saulsberry's Amended Complaint.  Def.'s Mot. for Summ. J., ECF No. 33, Mem. of P. & A. in Support of Def.'s Mot., ECF No. 33-1 [hereinafter Def.'s Mot.]. The court previously dismissed Plaintiff's retaliation and retaliatory hostile work environment claims.  *See generally* Order, ECF No. 20.  Plaintiff's remaining claims are (1) Defendant, on account of Plaintiff's race and sex, selected a less qualified white woman, Heidi Kugler, for the Chief Chaplaincy Administrator position in violation of Title VII, Am. Compl., ECF No. 6 [hereinafter Am. Compl.], ¶¶ 53–58; and (2) Plaintiff's supervisors engaged in a practice of discriminatory behavior that created a hostile work environment, *id.* ¶¶ 59–65.  For the reasons explained below, the court denies Defendant's Motion as to the non-selection claim and grants it as to the hostile work environment claim.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Attorney General as the defendant in this case.

## I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Accordingly, the inquiry under Federal Rule of Civil Procedure 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor, and if the court determines "no reasonable jury could reach a verdict in [the non-movant's] favor," then summary judgment is appropriate. *Wheeler*, 812 F.3d at 1113. When ruling on a summary judgment motion, the court does not "make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II.

### A.    Plaintiff's Non-Selection Claim

Defendant argues that Plaintiff's non-selection claim fails because the Bureau of Prisons ("BOP") had a nondiscriminatory reason for selecting a white woman, Heidi Kugler, as the Chief

Chaplaincy Administrator over Plaintiff, an African American man—namely, Kugler was the superior candidate because of "her prior relevant experience as the Assistant Chaplaincy Administrator."  Def.'s Mot. at 8.

Claims based on circumstantial evidence, like Plaintiff's, trigger the three-step, burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  *Id.* at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  If a plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing "evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507 (internal quotation marks omitted)).  If the defendant rebuts the presumption, the burden shifts back to the plaintiff to discredit the employer's nondiscriminatory explanation.  *Id.* at 1288–89.  Where, as here, the employer has asserted a legitimate, non-discriminatory reason for the employment decision at issue, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494; *see also Hamilton v. Geithner*, 666 F.3d 1344, 1347 (D.C. Cir. 2012).

There are multiple ways a plaintiff may support an inference that unlawful discrimination, rather than the employer's stated reason, motivated an adverse employment discrimination.  The "common ways of proving invidious motive—whether retaliation or discrimination—include pointing to evidence that . . . the employer is 'lying about the underlying facts' of its decision; that

there were 'changes and inconsistencies' in the employer's given reasons for the decision; [or] that the employer failed to 'follow established procedures or criteria.'"  *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495 & n.3).  Where a plaintiff claims discriminatory non-selection, he may present evidence of "disparity in qualifications" as well as "other flaws in the employer's explanation."  *Hamilton*, 666 F.3d at 1352 (internal quotation marks omitted).  Here, Plaintiff puts forward two principal arguments to attack Defendant's proffered non-discriminatory explanation: (1) Plaintiff has superior qualifications for the position; and (2) there were procedural irregularities in the highly-subjective selection process.  Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 39 [hereinafter Pl.'s Mot.], at 5.

The court begins with Plaintiff's claim that he "has significantly more experience than Ms. Kugler and was a more qualified candidate for the Chief of Chaplaincy Services position." Am. Compl. ¶ 31; *see also* Pl.'s Opp'n at 5–11.  Specifically, Plaintiff had served as a staff chaplain at five different correctional facilities covering every security level "and nearly every type of institution under the Bureau's authority."  Am. Compl. ¶ 31; *see also* Pl.'s Stmt. of Disputed Facts, ECF No. 39-1 [hereinafter SDF], ¶ 2.  Plaintiff's responsibilities in these positions included "duties [over] male and female inmates, medical centers, prison camps, detention centers, low-, medium-, and high-security units, protective custody units, the death and dying program, domestic terrorists, sexual offender programs, and violent crimes and serious offenders populations."  Pl.'s Mot. at 6 (citing Plaintiff's Exhibit ("PEX")[2] 7 at 969–71, 980–93; PEX 1 at 61:10-19; PEX 17 at 1–2; PEX 21 at 14–16); SDF ¶ 2.  Plaintiff also had extensive experience working with inmates from a wide variety of faith groups.  SDF ¶ 38.  As the Complex Supervisory Chaplain in Butner, North Carolina, for example, Plaintiff had a supervisory role over five correctional institutions, which

---

[2] Plaintiff's Exhibits, noted as "PEX," are found at ECF No. 39.

housed prisoners representing over twenty different religious faith groups.  Pl.'s Mot. at 7 (citing PEX 7 at 980–83, PEX 1 at 31:5–32:1).

By contrast, Kugler had worked at only two facilities—the first a low-security, male-only facility, and a second that housed 800 inmates in transit—and she had never worked as a supervisor at a Federal Correctional Complex. Pl.'s Mot. at 7.

Plaintiff maintains that the depth and breadth of his field experience make him a better candidate for the Chief Chaplaincy Administrator position.  As he points out, the position description for the Chief Chaplaincy Administrator states that the Chief Chaplain "must have knowledge of the religious beliefs and practices of all faith groups identified within [the] inmate population," "[k]nowledge of the purpose and scope of chaplaincy services within a prison setting," and "[k]nowledge of inmate management (custody, care and treatment)." PEX 19 at 275; *see also* Pl.'s Mot. at 8.  The description further provides that the Chief Chaplain "must have knowledge of the variety of institutions, inmate populations and the resulting problems presented by the various combinations," *id.* at 276, and "must have a thorough understanding of the operating problems involved in working within an institution," *id.* at 277.  The description also contemplates that the Chief Chaplain will "give and exchange information regarding religious issues within prisons," and expects that the Chief Chaplain will "[i]nterface[] with all religious faiths groups regarding their advocacy issues of concern."  *Id.* at 277–78.

In addition to his broader experience with different inmates from different religious backgrounds, Plaintiff also argues that he has more extensive supervisory experience than Kugler. He had supervised 18 staff members in a variety of positions including 10 chaplains, a program coordinator, a religious services assistant, and a mentor coordinator, as well as worked with more than 500 volunteers and 20 contractors over his career at BOP.  Pl.'s Mot. at 9 (citing PEX 17 at

1–2; PEX 7 at 980).  By contrast, Kugler had supervised only two employees in her field positions and an additional three employees in the Central Office of the Chaplaincy Services Branch.  *Id.* (citing PEX 16 at 000308; PEX 5 at 25:15–26:14).  Moreover, Plaintiff points out that he has more years of experience than Kugler, having worked at BOP for more than fourteen years to Kugler's thirteen, and he holds a Doctorate of Ministry and a Master of Divinity, whereas Kugler has only the latter.  PEX 18 at 299–300; Pl.'s Mot. at 10 (citing PEX 7 at 976; PEX 16 at 308).

Defendant does not dispute that Plaintiff was qualified for the position but contends that Kugler was the *best* qualified candidate because she had served longer in the Central Office and because she had performed duties similar to the Chief Chaplaincy Administrator in her role as Assistant Chaplaincy Administrator.  Def.'s Mot at 10–11; SDF ¶¶ 32–33, 37.  Patti Butterfield, the Senior Deputy Assistant Director of the Reentry Services Division, testified that she evaluated and ranked the candidates for the Chief Chaplain position, placing Kugler above Plaintiff on account of Kugler's better oral communication skills and because of her experience as Assistant Chaplaincy Administrator.  Def.'s Mot. at 3, 13; SDF ¶¶ 24–25, 33.  Linda McGrew, a white woman and the Assistant Director of the Reentry Services Division, ultimately selected Kugler over Plaintiff because "Kugler had been serving in the role of Assistant Chaplaincy Administrator. As such, her position description largely mirrored that of the Chaplaincy Administrator, and she had already been performing on a delegated basis many of the same responsibilities and functions that would be required of the Chaplaincy Administrator." SDF ¶ 36 (citing Defendant's Exhibit ("DEX")[3] 14, at 124:9–125:14; DEX 15; DEX 16).

Indeed, like the Chief Chaplain, who is responsible for "[d]evelop[ing] and refin[ing] national policy regarding religious beliefs and practices," and "[e]valuating all aspects of policy

---

[3] Defendant's exhibits, noted as "DEX," are found at ECF No. 33.

relating to religious ministry and chapel programming for all facilities of the Bureau of Prisons," PEX 19 at 274, the Assistant Chaplaincy Administrator "monitors chaplaincy programs throughout the BOP" and "evaluates all aspects of policy relating to religious ministry and chapel programming for all facilities of the BOP," DEX 16 at BOP0494.  Moreover, the Assistant Chaplaincy Administrator provides "technical assistance and coordination of all activities related to pastoral care and religious programs," *id.*, and both the Chief Chaplain and the Assistant Chaplaincy Administrator "[p]rovide[] national overview, technical assistance and coordination of all activities related to pastoral care and religious programs," *id.*, PEX 19 at 274.  Plaintiff disputes, however, the overlap between Kugler's role as Assistant Chaplaincy Administrator and the Chief Chaplain position, arguing that Kugler's responsibilities as Assistant Chaplaincy Administrator actually focused on "handling administrative grievances and litigation, responding to congressional inquiries, and, later in Ms. Kugler's tenure, overseeing the [Chaplaincy Services Coordinators]" in the Central Office," SDF ¶ 33; *see also* Pl.'s. Mot. at 9–10.

Reviewing the relative qualifications of Plaintiff and Kugler as set forth in the record, the court finds that a reasonable jury could conclude that Plaintiff is more qualified than Kugler but would not find him "substantially more qualified."  *Holcomb*, 433 F.3d at 897 (internal citation omitted).  As the D.C. Circuit has explained, "a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate." *Hamilton,* 666 F.3d at 1352 (quoting *Holcomb*, 433 F.3d at 897).  Here, while Plaintiff possesses broader and deeper experience in some areas, the court is unable to conclude that he is "substantially more qualified" given Kugler's comparable education qualifications and her

7

relevant tenure as Assistant Chaplaincy Administrator.  *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (explaining that "[i]n cases where the comparative qualifications are close," courts "must respect the employer's unfettered discretion to choose among qualified candidates" (internal quotation marks and citations omitted)).

That conclusion does not end the court's analysis, however.  In addition to his disparate qualification argument, Plaintiff also points to additional "procedural irregularities in a highly subjective selection process," *Hamilton*, 666 F.3d at 1352, as evidence from which a reasonable jury could conclude that Defendant's stated reason for Plaintiff's non-selection is pretextual, *see* Pl.'s Mot. at 11–18.  Specifically, he describes variations from BOP's standard hiring practice, the use of subjective criteria, and the lack of contemporaneous documentation substantiating Defendant's selection decision.  *Id.*

Plaintiff complains of a number of alleged procedural irregularities in the selection process. Linda McGrew, the Assistant Director of the Reentry Services Division and the selecting official for the Chief Chaplain position, admitted that she did not have "direct observation of [Plaintiff's] duties," PEX 2 at 59:25–60:2, or "enough knowledge or day-to-day interaction" to assess his qualifications, *id.* at 61:25–62:6, yet she did not interview any of the candidates, *id.* at 86:11-14; SDF ¶ 18, or personally speak to Michael Smith, the African-American incumbent Chief Chaplain who had directly supervised both Plaintiff and Kugler for a number of years, SDF ¶ 27 (citing PEX 9 ¶¶ 24–25; PEX 2 at 75:19–77:1).  Smith would have been an obvious person to contact to assess and compare his supervisees' relative strengths and weaknesses, and Smith stated that in his past experience with McGrew, as the selecting official, she would have contacted him, as a recommending official.  PEX 9 at ¶ 25.

Instead, McGrew relied on materials prepared by Patti Butterfield, also a white woman and the Senior Deputy Assistant Director of the Reentry Services Division. SDF ¶ 19. Butterfield had taken over that role six months prior and had worked with Plaintiff and Kugler in only a limited capacity. *Id.* Butterfield reviewed the applications and conducted reference checks, including reaching out to Smith for a brief phone call sometime after Smith had completed the reference forms. *Id.* ¶¶ 19, 27. Smith stated that this, too, was unusual, given that such conversations would normally take place in person and "promptly" after he completed the forms, rather than allowing a "significant [time] gap" between the reference forms and the conversation. PEX 9 ¶ 23. Butterfield testified that Smith recommended, in order of preference, Mary Tyes-William, an African-American woman, Kugler, and then Saulsberry, yet Tyes-William did not appear on the final three candidates for review. SDF ¶¶ 27–28, 31; *see also* PEX 3 at 105:18–106:4. Plaintiff disputes his ranking, claiming that Smith told Plaintiff that he had recommended Saulsberry over Kugler. SDF ¶ 29.

Butterfield then composed a summary chart of the top three candidates' qualifications in order of her recommendation: Kugler first, Plaintiff second, and a white male candidate third. *Id.* ¶ 31; PEX 18. In her deposition, however, McGrew stated that normally Smith would have prepared the summary chart rather than Butterfield. PEX 2 at 45:25–46:13. And according to Plaintiff, the chart is far less detailed than the spreadsheets Plaintiff had been asked to prepare by McGrew in other selections she had conducted in the past. SDF ¶ 31.

Plaintiff also points out that both Butterfield's and McGrew's assessment rely on subjective criteria. While Smith assigned both Saulsberry and Kugler identical, above-average ratings in all six specified skills and abilities, above average on leadership, and suitable for the position, *id.* ¶¶ 22–23, Butterfield rated Saulsberry average in "oral communication" and Kugler above

average, *id.* ¶¶ 24–25.  Plaintiff maintains that Butterfield's lower oral communication score is based on only two personal interactions with him.  Pl.'s Mot. at 14.  Additionally, Plaintiff asserts that in another selection process, Butterfield had given the two candidates—one a white man, one an African-American woman—top marks in all categories except that she gave the African-American candidate a lower score in oral communication as compared to the white candidate.  *Id.* at 14–15 (citing SDF ¶ 24).  With respect to McGrew, Plaintiff contends that she, too, identified "subjective criteria" that made Kugler better suited for the Chief Chaplaincy position, such as Kugler's "ability to develop policy and national initiatives," "ability to work with outside religious and faith-based organizations," and "leadership abilities."   Pl.'s Mot. at 21 (citing SDF ¶¶ 36–38).  Yet Smith testified that he shared with Butterfield his opinion that Kugler's "leadership skills were not a strength."  DEX 3 at ¶ 3.

Finally, Plaintiff points to the lack of contemporaneous documentation supporting either Butterfield's or McGrew's hiring evaluations and McGrew's ultimate decision.  Butterfield's only documentation of the call between Butterfield and Smith was the sticky note recording Smith's ratings.  SDF ¶¶ 28, 33.  The comparison chart prepared by Butterfield includes no comments comparing the three candidates nor any comments noting Kugler's specific suitability for the position given her role as Assistant Chaplaincy Administrator.  *See* PEX 18.  Nor is there any documentation regarding Butterfield's discussion of the candidates with McGrew, SDF ¶ 36; *see also* PEX 2 at 47:13–48:5, and, McGrew took no notes when she reviewed the applications and made her ultimate selection, SDF ¶¶ 33–34, 36.

Taken together, the court is persuaded that Plaintiff has adduced sufficient additional evidence in the record from which a reasonable jury could conclude that Defendant's stated reason for Plaintiff's non-selection is pretextual.  The selection process appears to have deviated from

standard practice in notable ways, including seemingly little input from Smith, who was Plaintiff's and Kugler's direct supervisor.  Moreover, Plaintiff has pointed to statements made by Butterfield and McGrew regarding subjective criteria, such as oral communication and leadership skills.  The D.C. Circuit has explained that such subjective hiring criteria should be "treat[ed] . . . with caution on summary judgment."  *Hamilton*, 666 F.3d at 1356; *see also Aka*, 156 F.3d at 1298 (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution" and that "an employer's heavy use of highly subjective criteria, such as interpersonal skills, could support an inference of discrimination" (internal quotation marks omitted)).  This is because "[s]ubjective criteria lend themselves to racially discriminatory abuse more readily than do objective criteria."  *Harris v. Group Health Ass'n*, 662 F.2d 869, 873 (D.C. Cir. 1981).  Finally, a jury could find troubling the lack of contemporaneous notes evaluating Plaintiff relative to Kugler.  In *Hamilton*, the D.C. Circuit denied summary judgment in part because of the "absence of any contemporaneous documentation supporting" the defendant's stated rationale for the plaintiff's discriminatory promotion claim.  666 F.3d at 1357; *see also Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 27 (D.C. Cir. 2013) (observing that "the missing notes could have provided a more complete picture of what transpired during the interview process, especially regarding the types of questions the panelists asked generally and of specific applicants and their focus on particular qualities of an applicant").  Here, too, the absence of important contemporaneous documentation supports the denial of summary judgment as to Plaintiff's non-selection claim.

In sum, viewing the record as a whole and in the light most favorable to Plaintiff, the court concludes that a genuine issue of material fact exists as to whether Defendant's stated rationale for Plaintiff's non-selection is pretextual, and thus a reasonable jury could conclude that Plaintiff was

actually not selected on account of his race.  The court concludes the same as to Plaintiff's sex discrimination claim, although that is a closer call.   A reasonable jury could infer sex discrimination based on the decision-makers and the selected candidate all being women; Plaintiff's greater field and supervisory experience than Kugler's; unusual aspects of the selection process, including McGrew's failure to consult with Smith, a male; and the lack of contemporaneous notes documenting the rationale for selecting Kugler over Plaintiff.  "Of course, after hearing live testimony, assessing witness credibility, and weighing the evidence," a jury might well conclude that Defendant's stated rationale is legitimate because Kugler was better suited for the position, Butterfield's and McGrew's assessments about Plaintiff's oral communication and leadership skills did not mask a discriminatory motive, and the absence of interview notes and the various deviations from standard hiring procedures were innocuous. *See Hamilton*, 666 F.3d at 1357.  These are, however, questions for the jury to resolve. The court therefore denies Defendant's motion for summary judgment as to Plaintiff's non-selection claim.

### B.    Plaintiff's Hostile Work Environment Claim

Up next is Plaintiff's hostile work environment claim.  In support of this claim, Plaintiff points to a number of workplace incidents and actions taken by two white female supervisors, Kathryn Tracy and Heidi Kugler, from 2012 to 2017.  Pl.'s Opp'n at 23–33.  These include: (1) Tracy did not greet Plaintiff in the morning or otherwise acknowledge him, Am. Compl. ¶ 19; SDF ¶ 41; (2) Tracy did not allow Plaintiff to serve as Acting Chief or Senior Deputy Assistant Director during absences and instead appointed Kugler or other white employees, Am. Compl. ¶¶ 26–28; SDF ¶ 63; (3) Tracy blocked Plaintiff's efforts to join a Department of Justice leadership program but sponsored the participation of white women, including Kugler, Am. Compl. ¶ 29; SDF ¶ 94; (4) in September 2012, Tracy criticized a prayer Plaintiff had delivered and instructed

Smith to speak to him about it, Am. Compl. ¶ 21; SDF ¶¶ 47–49; (5) also in September 2012, Tracy initially forbade Plaintiff and Smith from attending a training seminar for prison chaplains, Am. Compl. ¶ 22; SDF ¶¶ 53–55; (6) in August 2013, Tracy instructed Plaintiff to stop producing a newsletter, Am. Compl. ¶¶ 23–24; SDF ¶ 74; (7) in August 2014, Tracy yelled at Plaintiff and Smith when she came upon them dismantling, with the help of building management, portable walls and erecting new walls to create a shared workspace, SDF ¶ 88; (8) in November 2015, Kugler was selected as Chief Chaplaincy Administrator over Plaintiff, Am. Compl.  ¶¶ 30–31; SDF ¶ 35; (8) Kugler assigned Plaintiff an "excellent" performance ratings even though he believed he deserved to be rated "outstanding," Am. Compl. ¶¶ 37–50; SDF ¶¶ 117, 129, 135; (9) in the spring of 2017, Kugler asked Plaintiff to notify her before leaving the office, Am. Compl. ¶ 52; SDF ¶ 138; and (10) Kugler approved Plaintiff for only one day of telework per week when he had applied for three, but she did not apply this same treatment to white colleagues, SDF ¶¶ 144–45.

According to Plaintiff, the actions by Tracy and then Kugler "isolate[d] [Plaintiff] in the office, ensure[d] he was systematically denied career advancement opportunities, ignored . . . proposals and initiatives he sought to implement, blocked [him] from performing tasks or duties" that could "grow and build his experiences" and "increase his exposure," "denied [him] important training and leadership opportunities," "subjected [him] to unfair performance criticisms and unjust double standards, and berated [him] for simply trying to do his job to the best of his ability." Pl.'s Mot. at 33.

Still, Plaintiff has failed to show that he was subjected to a hostile work environment. To prevail on a claim of hostile work environment, a plaintiff must "show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or

13

pervasive to alter the conditions of [his or her] employment and create an abusive working environment.'" *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 91 (D.D.C. 2005). In assessing hostile work environment claims, then, courts look to the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Only one of the incidents comes close to being threatening, humiliating, or insulting.  In September 2012, Tracy refused to allow Plaintiff and Smith to travel to an African Methodist Episcopal Church conference and training seminar for prison chaplains, telling Smith, "I don't know who all these black people are who's [sic] going to be at this seminar.  For all I know, Louis Farrakhan could be one of the speakers." Am. Comp. ¶ 22; SDF ¶¶ 55, 60.  Though the court finds this incident troubling, Tracy did not make the comment directly to Plaintiff; instead, he heard it second-hand from Smith.  *Id.* ¶¶ 55, 61; PEX 9 ¶ 16.  "Comments made outside of the employee's presence are generally not actionable as the basis for a hostile work environment claim." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 91 (D.D.C 2013); *see also Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) (plaintiff's report that he heard that "racial and prejudicial remarks" were being made against him, but not in his presence, was not sufficiently severe as to create a hostile working environment); *Mason v. So. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 n.9 (7th Cir. 2000) (rejecting hostile environment claim where a coworker told the plaintiff that other employees had used racial epithets because "through the grapevine" conduct is not

sufficiently severe or pervasive).  As a result, Tracy's comment to Smith, as well as several other incidents that were not experienced first-hand by Plaintiff—including Tracy asking Smith to talk to Plaintiff about a prayer he gave in September 2012, Tracy stating a preference that only Kugler serve as acting Chief Chaplain in February 2013, and Tracy expressing anger at an accusation that Plaintiff had supposedly submitted an application to run a halfway house in March 2014, *see* SDF ¶ 82—fail to support his claim of a hostile work environment.

As for the remaining incidents about which Plaintiff complains, these are the types of work-related disputes not sufficiently severe or pervasive to be actionable as a hostile work environment claim.  *Bell*, 398 F. Supp. 2d at 92.  For example, Plaintiff claims that he was required to discontinue circulating a newsletter about chaplaincy training even though Kugler was permitted to circulate a comparable newsletter that she initiated around the same time. SDF ¶¶ 71–75, 77. Although Plaintiff was instructed to discontinue sending the formal newsletter, he was able to continue sending the same essential information in an email format that did not have to be preapproved by Tracy.  *Id.* ¶ 76.  Plaintiff also claims that he was not assigned to serve as acting Chaplaincy Administrator during Smith's absences.  *Id.* ¶ 63.  But the record shows that it was the practice in most branches in the Reentry Services Division that the assistant administrator would generally serve as acting administrator when the administrator was out of the office.  *Id.* ¶ 65.  And, when Plaintiff objected to this practice, the Chaplaincy Services Branch changed its practice to rotate the assignment among the central office staff, including Plaintiff.  *Id.* ¶¶ 67–69.  He also claims that in 2014 Tracy allegedly raised her voice when she came upon Smith and Saulsberry rearranging the office walls, *id.* ¶¶ 88–93, and was generally rude and dismissive, *id.* ¶ 41.  But these workplace indignities are neither severe nor pervasive enough to comprise a hostile work environment.

In short, these incidents, spread over several years, do not amount to conduct constituting a hostile work environment.  Plaintiff alleges no "discriminatory intimidation, ridicule, and insult," that "alter[ed] the conditions of [Plaintiff's] employment and create an abusive working environment." *Meritor Sav. Banks, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986).  Rather, these incidents reflect "[o]ccasional instances of less favorable treatment involving ordinary daily workplace decisions [which] are not sufficient to establish a hostile work environment."  *Bell*, 398 F. Supp. 2d at 92 (citations omitted) (granting summary judgment to the defendants where they, among other things, "monitored [the plaintiff's] behavior more closely than that of other employees, excluded him from the informal chain of command and staff meetings, restricted his travel and teaching assignments, restricted his high visibility projects, reprimanded and criticized him, and spoke to him in derogatory terms"); *see also Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6–7 (D.D.C. 2012) (holding that no reasonable jury could find a hostile work environment where supervisor gave plaintiff negative performance appraisals, criticized her, increased scrutiny of her work, raised his voice during meetings, and placed her in a "Team of One," which isolated her from her coworkers).

With respect to Kugler's actions, Plaintiff's main claim is that she held Plaintiff, but not the other white employees, to the Reentry Services Division telework policy, limiting him to only one day of telework per week rather than his preferred three days.  SDF ¶¶ 144–45.  But even if the telework policy were selectively enforced, such selective enforcement of office attendance policies "does not necessarily indicate conduct giving rise to a hostile work environment claim." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).   As for Kugler's assignment of "excellent" rather than "outstanding" ratings, SDF ¶¶ 117, 123, 129, 135, these performance reviews "do little to evince abusive conditions," *Brooks*, 748 F.3d at 1276.  The "excellent" ratings

are nevertheless favorable for Plaintiff, and while Kugler offered inconsistent explanations for the standards attached to "outstanding" versus "excellent" ratings, when Plaintiff disagreed with his ratings, Kugler re-reviewed her evaluations and occasionally adjusted some of Plaintiff's scores. SDF ¶¶ 118, 122, 130, 133.  This is "hardly the stuff of severe or pervasive workplace hostility." *Brooks*, 748 F.3d at 1277.

In the end, Plaintiff has not met his burden of establishing a hostile work environment.  The court will grant summary judgment to Defendant on this claim.

### III.

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 33, is granted in part and denied in part.

Dated:  June 23, 2020

Amit P. Mehta
United States District Judge